IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TERRI DAVIS, et al. | : | CIVIL ACTION |
| Plaintiffs | : | |
| v. | : | |
| UNITED STATES OF AMERICA, et al. | : | NO. 09-198 |
| Defendants | : | |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE                                                                                              AUGUST 29, 2012
UNITED STATES MAGISTRATE JUDGE

On March 28 and 29, 2012, the Court presided over a nonjury damages trial to determine the appropriate sum to compensate Plaintiff Troy Dease ("Dease" or "Plaintiff") for the injuries he suffered as a result of an automobile accident that occurred on October 22, 2007. The vehicle Mr. Dease was riding in collided with a truck owned by the Department of Veterans Affairs (the "VA"), serviced by M-D Truck Sales and Services, Inc. (collectively "Defendants"), and operated by Robert Hummel, an employee of the VA. Following the trial the parties requested the opportunity to file proposed findings of fact and conclusions of law upon the completion of the transcripts from the hearing. We granted their request. (*See* Doc. No. 74.) The record having been prepared, the parties submissions having been filed and duly considered, the matter is now ripe for a ruling. Based upon our review of the testimony offered at trial, these submissions, and for the reasons articulated below, the Court awards Plaintiff Troy Dease $42,035.00 in damages.

I. **Findings of Fact**

On October 22, 2007 at approximately noon, Dease was in the front passenger seat of a minivan operated by his then girlfriend Terri Davis. He and Ms. Davis were traveling east on Route 322 near Lebanon, Pennsylvania, on their way to Hershey Medical Center[1] when a dump truck owned or leased by the VA came into their lane and struck the minivan.[2] (*See, e.g.*, *see* Doc. No. 8 at ¶ 10.) The dump truck had a snowplow attached to its front end. The minivan was severely damaged, particularly on the driver's side where Ms. Davis was sitting. (N.T. 03/28/2012 at 200:2-3. *See also* Pl.'s Ex. P-1A, P-1B.) At the trial, Plaintiff testified that he was knocked momentarily unconscious by the deployment of the minivan's airbags, but after regaining consciousness, he functioned well enough to be able to assist Mr. Hummel in the effort to extract Ms. Davis from the wreckage. (N.T. 03/28/2012 at 29:20-30:18. *See also* 201:10-14, for Mr. Hummel's corroborating testimony.) The collision destroyed the front end and shattered the windows of the minivan. Ultimately the first responders had to cut the roof of the van off in

---

[1] Plaintiff was on his way to Hershey Medical Center to see Dr. Paul Juliano for treatment for his right ankle, which had been injured in 2006. (N.T. 03/28/2012 at 29:14-20. *See also* Defs.' Ex. 87, 161.)

[2] Although Plaintiff has characterized the collision as "head on", we note that in its answer to the complaint, the government clarified that
> [a]t the date and approximate location stated in the complaint, Defendant's employee was driving the vehicle in question (Ford F-800 truck) when traffic ahead of him suddenly halted. Defendant's employee braked his vehicle. Suddenly, the left front tire failed, causing the truck to pass into the oncoming lane and strike plaintiff's car in a sideswipe-type manner, not head on.

(Doc No. 8 at ¶ 11.) Additionally, Hummel testified that at the time of the collision, his truck's speed was between 5 and 10 miles per hour. (N.T. 03/28/2012 at 198:17-18.) There is no evidence on the record to indicate how fast Plaintiff and Ms. Davis were traveling.

order to free Ms. Davis. (N.T. 03/28/2012 at 31:22-34:5.)

Plaintiff, who was forty-five years old at the time of the accident, was taken by ambulance to the Hershey Medical Center emergency room ("ER"). (*Id.* at 35:1-4. Agreed Facts at ¶ 18.) He was held for approximately two hours and released with a neck brace. (Agreed Facts at ¶¶ 18-20, N.T. 03/28/2012 at 37:8-10.) While at the ER, he underwent multiple tests to assess his injuries, including his back. (N.T. 03/28/2012 at 36:23-25.) In response to questioning about the level of pain he felt, Plaintiff reported pain in various parts of his body but not in his back. (Defs.' Ex. 28 at 1.) Other parts of the ER record, however, reflected that he had "[c]ervical and lumbar spine tenderness" (Defs.' Ex. 28 at 1), and complained of "mild midcervical and mid lumbar spinal pain", but of "[n]o apparent thoracic pain." (*Id.* at 17.) Plaintiff underwent a series of CT scans while at the ER, including one of his thoracic area, and none of which revealed any objective evidence of injury.[3] (Agreed Facts at ¶ 21, Defs.' Ex. 28 at 41.) In summary, the ER discharge form that provides instructions to patients for self-care recorded that Plaintiff had symptoms of back sprain but had suffered "no serious injury" from the accident. (Defs.' Ex. 28 at 6.)

Eight days later, on October 30, 2007, Plaintiff saw Dr. Menges, his orthopedist. (Defs.' Ex. 82.) Dr. Menges noted that while Plaintiff complained of being "stiff and sore", he made no reference to any new injury. (*Id.*) The doctor prescribed Percocet for "aches and pains", which

---

[3] The CT scan of Plaintiff's thoracic region did note the presence of a "bone island" at T6. (Defs.' Ex. 28 at 41.) A bone island, or enostosis "represents a focus of mature compact (cortical) bone within the cancellous bone (spongiosa). It is a "benign lesion" that "is probably congenital in development in origin" and is "[t]ypically asymptomatic." Greenspan, A. *Bone island (enostosis): current concept—a review*, available at: http://www.ncbi.nlm.nih.gov/pubmed/7747175. It is "[t]hought by some to be a tumor-like condition and by others a hamartoma". *Id.*

"result[ed]" from "the knees and lower back and neck problems". (*Id.*) Significantly, Dr. Menges then reported that "this is an ongoing thing, nothing that we diagnosed new at this visit." (*Id.*)

The next day, October 31, Plaintiff saw Dr. Eric Ratner, his pain management physician, for a cervical epidural steroid injection that had been scheduled prior to the accident. (N.T. 02/21/2012 at 101:8-19.) Dease made no complaint of thoracic or middle back pain at that time. (*Id.* at 178:17-22.) Similarly, he made no complaint of thoracic or middle back pain at the time of his November 26, 2007 visit to Dr. Ratner, and reported the same subjective 8 out of 10 pain level in his neck and lower back as he had reported in June 2007, four months prior to the accident. (N.T. 02/21/2012 at 111:9-17, 178:23-179:22.)

### A.   Plaintiff's Condition Before the Accident

It is undisputed that Plaintiff had an extensive medical history prior to the accident, including for coronary artery disease, pulmonary malfunction, liver disease and cirrhosis, chronic obesity, severe anemia, acute renal failure, degenerative arthritis, osteoarthritis, joint pain, kidney disease, depression and, as is particularly relevant to our analysis, "chronic body pain". (*See, e.g.*, Gov't Exhibits 52-63, 80.) He had begun pain management treatment with Dr. Ratner in December of 2006, some ten months before the accident. (Agreed Facts at ¶¶ 4, 6.) At his initial appointment with Dr. Ratner, Plaintiff complained of "total body pain" and identified seventeen distinct areas in his body where he said he experienced chronic pain. (Agreed Facts at ¶¶ 9-10.) Using a subjective pain scale of 0 to 10, Dr. Ratner noted that at the time of the June 2007 visit, Plaintiff self-reported his lower back pain as 8 out of 10. (Defs.' Ex. 8.)

In the course of his treatment prior to the accident, Plaintiff received three epidural steroid

injections to his lumbar spine, the last of which occurred on September 27, 2007, one month before the accident. (Agreed Facts at ¶¶ 13. *See also* N.T. 03/28/2012 at 28:5-13.) At trial, Plaintiff testified that this last injection in September had reduced his pain level to a 4 out of 10. (N.T. 03/28/2012 at 28:12-21.) Plaintiff had another epidural steroid injection for his neck scheduled for October 24, 2007, but it was postponed to October 31 due to the intervening accident. (Defs.' Ex. 22.)

It is Plaintiff's position that he had been functioning well before the accident. While he had not had regular employment since "either 2001 or 2002" (N.T. 03/28/2012 at 140:18-21), he testified that he regularly participated in doing household chores and enjoyed playing baseball, football and riding bicycles with his children and grandchildren. (*See, e.g., id.* at 57:5-18.) Ms. Davis, his partner of eighteen years at the time of the accident, was somewhat more reserved but acknowledged that before the accident, Plaintiff was afflicted with various ailments including issues with the joints in his knees and ankles, hepatitis C, and cardiac problems. (N.T. 03/28/2012 at 155:14-157:10.) She also freely testified that Plaintiff had a history of abusing prescription drugs and cocaine, while at the same time characterizing him as drug-free at the time of the accident.[4] (*See* N.T. 03/28/2012 at 156:7-14, in which Ms. Davis described that Dease "also went into a treatment program and was going to NA meetings and was actually clean for a really long time after that, like almost up until the accident, I believe.")

Ms. Davis reported that despite his ailments, Dease had been an able contributor to their

---

[4] We note, as well, that on cross-examination, Ms. Davis acknowledged that Plaintiff had used cocaine immediately prior to the accident and that earlier in the year had been admitted to Pottstown Hospital due to an injury resulting from his intravenous drug use. (N.T. 168:10-16; 18-21.)

household prior to the accident. She stated that he regularly did housework activities such as washing the dishes, doing the laundry, cooking, and yard work. (N.T. 03/28/2012 at 157:18-23.) She referred to him as a "stay-at-home dad" whose health problems had little effect on his ability to tend to family matters. (N.T. 03/28/2012 at 157:24-25, 160:7-14.)

On cross-examination, however, defense counsel pointed out that Ms. Davis had testified at her deposition that she was the one primarily responsible for household tasks in their home. (N.T. 03/28/2012 at 170:14-23.) Ms. Davis later clarified at trial that she meant that she was the head of the household "emotionally", which meant that she "took care of the bills", was the "sole breadwinner" and "took care of the household, keeping it together." (N.T. 03/28/2012 at 172:3-6.) Ms. Davis explained that she did not do all the chores in the home but was more responsible for "making sure the kids, everybody was where they needed to be." (N.T. 03/28/2012 at 172:6-8.) She again clarified further that Plaintiff "was home during the day, so he was basically responsible for the day-to-day chores prior to the accident, and he, you know, basically would do them as he could. And then I basically was the person who ran the household" meaning that she "took care of all the appointments, paid all the bills, made sure repairs were made, cars were taken for inspection, that type of thing." (N.T. 03/28/2012 at 186:21-187:3.)

We further note that on cross-examination of Plaintiff, defense counsel pointed out that he had testified at a deposition in another case that as late as January 2009 he had been able to do various activities with his children including playing baseball, football and riding bicycles. (N.T. 03/28/2012 at 97:14-19.) Plaintiff had also testified at that deposition to being able to do various household chores such as cooking, cleaning, and washing, and would regularly play shuffleboard in the evening. (*Id.* at 97:20-98:9.)

### B. Plaintiff's Condition After the Accident

There is little objective medical evidence to show that Plaintiff suffered physical injuries directly caused by the accident, at least with respect to his preexisting neck and lower back pain. In his videotaped testimony, Dr. Ratner conceded that multiple MRIs of Plaintiff's cervical and lumbar spine taken after the accident showed no significant objective difference compared to those taken prior to the accident. (Agreed Facts at ¶¶ 38-39.) Plaintiff asserts, however, that as a direct result of the accident, he suffered an injury to the thoracic area of his back as well as an aggravation of his preexisting neck and lower back injuries. (Pl.'s Proposed Findings of Fact at ¶¶ 6-9.) Plaintiff also alleges that his quality of life was drastically diminished as a direct result of the accident. (*See, e.g.*, Pl.'s Compl. at ¶ 28.) Ms. Davis corroborates that contention. She testified that Plaintiff experienced a great deal of pain after the accident. (N.T. 03/28/2012 at 160:21-24.) She attributed Plaintiff's subsequent doctor's visits to attempts to diagnose the cause of his increased pain. (*Id.* at 161:4-6.) Ms. Davis also described Plaintiff's various lifestyle changes—testifying that Plaintiff had to sleep in a recliner after the accident and could not stay in the same position for long periods of time. (*Id.* at 160:24-161:8.) She further described that Plaintiff could not do laundry, as it required using stairs to access the laundry room in the basement of their house. (*Id.* at 161:2-12.) He also could no longer complete routine automobile repairs to the family vehicle, as he had done prior to the accident. (*Id.* at 164:1-9.)

Ms. Davis also testified that before the accident, Plaintiff had a strong relationship with his son, Alex, and that they "basically did everything" together. (N.T. 03/28/2012 at 165:3-9.) After the accident, however, he was unable to participate in physical activities and that "he would get very depressed." (*Id.* at 165:9-12.) Ms. Davis testified that this also impaired his relationship

with his grandchildren. (*Id.* at 165:20-166:3.)

Ms. Davis further testified that she and Dease separated in April 2009 due to his increasing substance abuse problems, which she attributed to the accident. (*See, e.g., id.* at 174:20-24.) She felt that Plaintiff's relapse into continued illegal drug use was an attempt to "self-medicate" to deal with the emotional and physical pain he experienced after the accident.[5] (*Id.* at 163:5-10.) She ascribed Plaintiff's significant weight gain to his change of personality and the depression he felt after the accident.[6] (*Id.* at 173:17-22.)

### 1. Plaintiff's Thoracic Injury

Plaintiff also testified that after the accident, he had a "new pain" that was "harder" and "sharper" in his mid-back, and that this pain was distinct from his previously reported lower back pain. (*Id.* at 38:1-20.) Dr. Ratner testified that Plaintiff had not complained of pain in this thoracic area prior to the accident. (N.T. 02/21/2012 at 36:14-16.) He also noted that a September 2, 2008 MRI showed a disc protrusion in his thoracic spine at T7-T8, which was not present in any earlier studies. (N.T. 02/21/2012 at 27:22-28:21.) Following this diagnosis, Dr. Ratner administered three epidural steroid injections to Plaintiff's thoracic vertebrae, the last of which occurred on August 31, 2009. (N.T. 02/21/2012 at 26:15-19.) Plaintiff did not complain of any pain in his thoracic region following that last injection. (N.T. 02/21/2012 at 187:21-188:1.)

Defendants highlight that Plaintiff had not complained of thoracic pain to Dr. Ratner in

---

[5] Ms. Davis testified that she left Plaintiff in April 2009 due to this increased substance abuse. (N.T. 03/28/2012 at 174:9-24.)

[6] Plaintiff's weight had increased between seventy and one hundred pounds after the accident. *See*, *infra*, p. 9 (citing N.T. 03/29/2012 at 79:3-21).

the two visits he had in the month after the accident. Dr. Ratner opined nonetheless that the accident directly caused the displaced disc in Plaintiff's thoracic spine. (N.T. 02/21/2012 at 28:16-18.) Dr. Ratner elaborated,

> I do believe that it was caused by that motor vehicle accident. He didn't have any complaints of pain before. He complained of pain all over before that, but none in the thoracic area. After the accident, he complained of pain in the thoracic area. And I do believe that was due to the accident.

(N.T. 02/21/2012 at 36:6-19.)

### 2. Defendant's Evidence

Defendant's medical expert, Dr. Lawrence Kerson, testified that it was not possible to state with any certainty that Plaintiff's thoracic disc bulge was a direct result of the accident. (N.T. 03/29/2012 at 73:15-22.) He also disagreed with Dr. Ratner's view that the accident caused Plaintiff's thoracic pain given that Plaintiff had not complained of this pain in his visits to Dr. Ratner immediately following the accident. (*Id.* at 81:19-82:7.) Dr. Kerson testified that Plaintiff probably suffered musculoskeletal and soft tissue injuries from the accident but that these injuries would have, at most, lasted less than one year. (*Id.* at 80:3-17.) Dr. Kerson instead offered the explanation that Plaintiff's thoracic back injuries and pain were just as, if not more likely caused by something other than the motor vehicle accident. (*Id.* at 96:2-97:1.) Dr. Kerson also pointed out that the added mechanical stress of Plaintiff's significant weight gain of seventy to one-hundred pounds in the months following the accident certainly aggravated his back condition. (*Id.* at 79:3-21.)

Perhaps anticipating Dr. Kerson's testimony, Plaintiff testified that a slip-and-fall

accident he sustained in August 2008 had primarily injured his right hand and not his back.[7] (N.T. 03/28/2012 at 124:4-16, in which Plaintiff attested that "my main injury was my right hand. When I fell down, I sliced it.")  Dr. Ratner conceded that Plaintiff had not mentioned any slips or falls prior to his diagnosis of thoracic pain, but that it was still possible for a fall to have been one of the causes of the thoracic pain.  (N.T. 02/21/2012 at 184:10-186:4.)

### 3. Spinal Cord Stimulator

Plaintiff underwent a variety of treatments for his lower back pain since the accident.  On December 12, 2007, he was reevaluated Dr. Stanley Grabias as a potential candidate for spine surgery to address his lower back pain.[8]  (N.T. 02/21/2012 at 102:3-103:5.)  Defendants highlight that the reevaluation was undertaken purely on the basis of Plaintiff's own report that the three lumbar epidural steroid injections received prior to the accident did not provide adequate relief. (*See id.* at 105:8-22.)  As Defendant points out, he was initially rejected as a candidate for spine surgery. (*Id*. at 106:5-8.)  Given this circumstance and following a further epidural steroid injection to the lumbar spine on January 9, 2008 (*Id*. at 122:15-24), Dr. Ratner again recommended the implantation of a spinal cord stimulator.[9]  (Agreed Facts at ¶ 25.)  The doctor testified that he recommended the stimulator because Dease was not a viable candidate for spine

---

[7] Plaintiff experienced a slip-and-fall accident necessitating a trip to the emergency room on August 25, 2008.  (N.T. 03/28/2012 at 89:15-21; Defs.' Exs. 104-105.)  While the contemporaneous ER report for this slip-and-fall does mention that Plaintiff had reported back pain during the visit, no diagnostic tests were conducted at the time.  (N.T. 03/28/2012 at 124:8-12.)

[8] Plaintiff was originally evaluated for spine surgery prior to the accident. (N.T. 02/21/2012 at 103:16-24.)

[9] A spinal cord stimulator is a device surgically implanted into a patient's spine for pain relief.  It is considered a more aggressive form of pain relief than epidural steroid injections.

surgery (N.T. 02/21/2012 at 119:5-13), in that he (Dease) was not responding well to the injection therapy (*Id*. at 33:9-15), and he (Dr. Ratner) was concerned about Plaintiff's history of substance abuse, leaving the spinal cord stimulator as the best option to deal with the aggravation of Plaintiff's preexisting pain caused by the accident. (*Id*. at 199:21-200:1.) Upon cross-examination, however, Dr. Ratner admitted that he did not recommend more conservative treatments first, such as, *inter alia*, a TENS stimulator, a neck and back brace, aquatic therapy, chiropractic therapy, or massage therapy.[10] (*Id*. at 127:5-134:21.) Dr. Ratner also stated that he had made the recommendation after administering only a single epidural steroid injection to Plaintiff's lumbar spine post-accident (*Id*. at 119:14-122:24. *See also* Agreed Facts at ¶ 26), but had taken into account the entirety of Plaintiff's treatment history with him, not just the events that had happened post-accident. (N.T. 02/21/2012 at 126:5-127:4; Pl.'s Ex. 11.)

On May 7, 2008 and August 8, 2008, Dease had two additional lumbar spine injections. (N.T. 03/28/2012 at 43:15-20.) He also underwent lumbar ablation on April 15 and on May 1, 2009[11] (N.T. 02/21/2012 at 31:11-32:4; Pl.'s Ex. P6, P8), which regrettably did not alleviate his pain.[12] (N.T. 03/28/2012 at 44:8-11, 99:20-100:1.)

---

[10] According to the agreed upon facts submitted by the parties, "Dr. Ratner first recommended Plaintiff for a spinal cord stimulator, a more aggressive form of treatment than injections, on April 30, 2008, six months after the MVA, because Plaintiff's 'pain was not as well controlled with the lumbar injections," and because Plaintiff was not a surgical candidate." (Agreed Facts at ¶ 25.)

[11] Dr. Ratner described lumbar ablation as a process in which the medial branches attached to a major nerve in the spine are heated to a temperature of 80 degree Celsius, which provides longer lasting pain relief than an epidural steroid injection. (N.T. 02/21/2012 at 31:11-23.)

[12] Defendants point out that a contemporaneous medical record with Dr. Menges dated May 19, 2009 shows that Plaintiff did indeed feel some relief from the ablation: "He says that the [lumbar
(continued...)

On July 21, 2010, eleven months after his last lower back treatment, Plaintiff had a trial spinal cord stimulator implanted. (Agreed Facts at ¶ 32.) He tolerated this well (N.T. 02/21/2012 at 156:18-159:18, N.T. 02/21/2012 at 163:16-164:5) and a permanent spinal cord stimulator was implanted on October 29, 2010. (Pl.'s Ex. P2; Agreed Facts at ¶ 33.) Plaintiff testified that the stimulator provided some measure of relief (N.T. 03/28/2012 at 56:11-15), but in three visits in 2011 after implantation of the stimulator, he still described his pain at 8 out of 10, the same level reported before the implantation.[13] (Defs.' Exs. 24-26.)

### 4.     Other Injuries Suffered Post-Accident

Plaintiff's claim is complicated by injuries he suffered after the accident. On January 14, 2008, he saw Dr. Juliano for pain in his right ankle, which he rated at a 7 out of 10. (Defs.' Ex. 85.) He underwent a surgical procedure on this ankle on February 13, 2008. (Defs.' Ex. 87; N.T. 03/28/2012 at 82:15-21.) After that procedure, he continued to describe the pain as ranging from a 7 out of 10 to a 10 out of 10. (N.T. 03/28/2012 at 82:22-83:7.) On October 6, 2008, he saw Dr. Juliano again, this time for a torn Achilles tendon. (Defs.' Ex. 109-110.) On January 11, 2009, he suffered a fracture of his left fibula following a slip and fall on an icy sidewalk. (N.T. 03/28/2012 at 92:4-93:6.) He subsequently had five screws and a plate surgically implanted into

---

[12](...continued)
ablation] that Dr. Ratner did for him is helping . . . ." (Defs.' Ex. 127.)

[13] Dr. Ratner suggested that this result could be explained in that, while the stimulator was providing relief in suppressing some pain generators in Plaintiff's spine, there were other, different pain generators in his spine that were not affected by the stimulator and that were causing him to continue to report an 8/10. Plaintiff testified that the stimulator was only really effective for around a month or so after the accident until he became adapted to it. He testified that he now has to run the stimulator at a higher level of stimulation than when it was first implanted in order to experience the same degree of pain relief. (N.T. 03/28/2012 at 51:21-52:12.)

his left ankle. (Defs.' Ex. 119; N.T. 03/28/2012 at 93:8-15.) Plaintiff testified that in the time around the accident in our case (October 22, 2007), the pain in his ankle bothered him more than the pain in his back did. (N.T. 03/28/2012 at 93:16-24.) He further testified that the pain continued to bother him up to the time of the trial in this case. (N.T. 03/28/2012 at 94:6-11.) Plaintiff also had a total right knee replacement on April 1, 2010. (Defs.' Ex. 139; N.T. 03/28/2012 at 107:9-11.) After that surgery, he continued to describe the pain in his knee as being a 9 out of 10. (Defs.' Ex. 146.)

## II. Damages

Plaintiff has brought his claim under the Federal Tort Claims Act ("FTCA"). 28 U.S.C. §§ 1346, 2671, *et seq*. Pursuant to the FTCA, the liability of the United States is determined "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Thus, "the extent of the United States' liability under the FTCA is generally determined by reference to state law." *Molzof v. United States*, 502 U.S. 301, 305 (1992). Likewise, computation of damages is determined by reference to state law. *Feeley v. U.S.*, 337 F.2d 924 (3d. Cir. 1964). Here, Pennsylvania state law governs because the relevant conduct took place in Pennsylvania. *Montaperto v. Split Rock Resort*, 765 F.Supp. 852, 854 (M.D. Pa, 1991). Plaintiff seeks compensation for past and future medical expenses and for past and future pain and suffering.

### A. Past and Future Medical Expenses

#### 1. The Parties' Contentions

The parties have stipulated that the maximum recoverable past medical expenses is $44,176.02 and the maximum recoverable future medical expenses is $41,000.00, for a total of

$85,176.02. (Agreed Facts at ¶40.) Defendants argue, however, that the treatments that gave rise to these expenses were not all necessitated by this accident. (*Id.*)

As we have described above, Plaintiff and his treating physician have testified that he suffered injuries from the accident in the form of aggravation of preexisting conditions of his back, particularly with respect to the lumbar and cervical spine. Plaintiff also asserts that he suffered a new injury to the thoracic spine. Defendants and their medical expert contend that the more severe aspects of any injury suffered was due to causes independent of the accident and that the accident only caused short-term soft tissue injuries of minor significance. Defendants also contend that Plaintiff's spinal cord stimulator was not necessitated by the accident, and that any medical costs associated with the implantation and maintenance of the device are not recoverable in this case.

In weighing the conflicting medical evidence, we consider several factors. We appreciate the significance of the testimony of a treating physician who has had a long term longitudinal relationship with a plaintiff, particularly where that relationship predates the accident.[14] Such is the case here with respect to Dr. Ratner, the physician who had been treating Plaintiff for pain management since December 2006. We also appreciate, however, that the opinion of that treating physician must be considered in relation to the objective medical evidence.[15] Here we credit

---

[14] We observe that the Medical-Vocational guidelines used in Social Security Disability Insurance cases similarly credit treating physicians and provide some guidance here. *See, e.g.*, *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (describing that a judge normally should "accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patients condition over a prolonged period of time.")

[15] Again, borrowing from the Social Security disability appeals context, we observe that a treating physician's opinion must be considered in the context of the entire medical record as a
(continued...)

Defendants with presenting evidence from the contemporaneous medical record that casts some serious doubt over Plaintiff's claims of associating the claimed medical expenses with the accident. Several aspects of the contemporaneous medical record point to a lack of objective evidence of physical injury, including (1) ER reports from Hershey Medical Center at the time of the accident noting that Plaintiff suffered "no serious injury" (*see* Defs.' Ex. 28 at 6), (2) Plaintiff's subjective pain reports indicating no change in his own self assessment of pain after the accident as compared to before the accident (*see, e.g.* N.T. 02/21/2012 at 111:9-17), and the fact that Plaintiff's thoracic disc bulge, the only objective injury attributed to accident was not diagnosed until nearly one year after the accident.

Defendants understandably contest whether some or all of Plaintiff's post-accident treatment was causally related. Defendants emphasize that the spinal cord stimulator, which Dr. Ratner recommended because Plaintiff was not responding well to epidural steroid injections, was implanted after the doctor had administered only one epidural steroid injection to Plaintiff's lumbar spine post-accident. They also point to several other intervening events that necessitated significant medical treatment, including a slip-and-fall in January 2009 that required left ankle surgery and a total right knee replacement in April 2010. (N.T. 03/28/2012 at 92:22-93:15, Defs.' Ex. 119; N.T. 03/28/2012 at 107:9-11, Defs.' Ex. 139.) Defendants also effectively highlight Plaintiff's extensive medical history and evidence of significant impairments that he brought with

---

[15](...continued)
whole. *See, e.g., Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993), *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). The review process utilized in other FTCA cases within our Circuit is also instructive. *See, e.g.*, *Miller v. U.S.*, 287 Fed.Appx. 982, 984 (3d Cir. 2008) (in which the court validated the district court's exclusion the opinion of an expert witness who did not review the Plaintiff's medical record, in that the opinion was incongruous with the data contained in the rest of the record.)

him at the time of the accident and they have established from the medical record that plaintiff was abusing prescription narcotics, a situation that was further aggravated by abuse of cocaine and other street drugs. (Defs.' Exs. 66 and 67.) Supported by Dr. Kerson's contemporaneous analysis, this evidence collectively demonstrates, in Defendants' view, that most of the injuries of which Plaintiff complains predated and are unrelated to the MVA.

### 2. The Court's Conclusions

We accord significant weight to the testimony of Dr. Ratner with respect to Plaintiff's post-accident condition, and find that Plaintiff suffered an aggravation of his symptomatic, preexisting injuries to his lower back and neck as well as a new injury to the thoracic spine. We cannot, however, ignore the complications of Plaintiff's preexisting condition as well as the multiple post accident events which certainly contributed to his need for medical treatment and pain management. As Dr. Ratner considered the entirety of Plaintiff's situation in recommending the spinal cord stimulator, we too must consider all the pre- and post-accident evidence in assessing the extent of his damage award. We do so and award Plaintiff $17,035.00 for medical expenses, representing 20% of the maximum recoverable sum.

### B. Pain and Suffering

Under Pennsylvania law, pain and suffering damages may be awarded for physical pain and suffering, mental anguish, inconvenience, disfigurement, humiliation, and loss of enjoyment of life in a personal injury case. *McDonald v. U.S.*, 555 F.Supp. 935 (M.D. Pa 1983). We acknowledge the inherent and unavoidable imprecision of the process of calculating these non-economic damages. *See Mack v. Johnson*, 430 F.Supp. 1139, 1150-51 (E.D. Pa 1977) ("Obviously, there is not, and cannot be any precise formula for calculating damages. At best,

courts in grappling with this issue, can only arrive at a damage figure which represents a judgment based upon considerations of equity, reason, and pragmatism.").

Collectively, the testimony offered by all the witnesses confirms that the accident in which Plaintiff was involved was serious, and of a nature that could lead to significant bodily injury. We have already acknowledged, however, as Defendants emphasize, that there is little difference in Plaintiff's own accounts of his pain before and after the accident, and that there is minimal "objective" evidence from which to support the extent of physical harm alleged by Plaintiff and his witnesses. Nonetheless, based on the subjective accounts of pain offered throughout the testimony of Plaintiff, Ms. Davis and Dr. Ratner, and observing the photographic evidence of the impact of the collision, we conclude that the accident certainly had a significant impact on the pain and suffering experienced by Plaintiff, as well as on his activities of daily living and ability to enjoy life's pleasures. While some treatment modality including the spinal stimulator have had a positive impact, it is likely that he will have to live with chronic neck and back pain for the foreseeable future.

Yet we must weigh this evidence against the unfortunate reality that Plaintiff has suffered other injuries both before and after the accident, which while unrelated to the accident itself, certainly had an impact upon the pain and suffering he has experienced. We certainly must consider these various physical impairments, including the serious ankle and knee injuries, Plaintiff's pulmonary and cardiac problems, his arthritis and obesity, as well as his kidney and liver disease. The record also demonstrates that he suffered severe depression, had an extensive history of drug abuse and was inconsistent in his compliance with his ongoing medical treatment, all of which affected his pain and suffering both prior and subsequent to the accident.

Plaintiff would have us minimize these factors in our analysis. This we cannot do. He reported significant pain to his physicians before the accident, and many of his complaints subsequent to the accident do not match the objective diagnostic findings. On the whole, his testimony regarding how this particular accident impacted upon his daily activities is inconsistent at best. We conclude that these factors have impacted the pain and suffering he has felt since the accident. In our effort to segregate the pain and suffering attributable to the accident and taking into account his more limited life expectancy, we come to a figure of $25,000.

### III. Conclusion

For the reasons articulated above, we assess that the sum necessary to compensate Plaintiff Troy Dease for the harm suffered as a result of the accident is $42,035.00.

BY THE COURT:

  /s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE